## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARY PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cv-03064 |
| CITY OF QUINCY, ILLINOIS, a | ) | |
| Municipal Corporation, and | ) | |
| TERRY HAGAN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is Defendants City of Quincy, Illinois, a municipal corporation, and Terry Hagan's Motion to Dismiss (d/e 7). Defendants' Motion to Dismiss is DENIED. Although Count I of Plaintiff's Complaint does not state a procedural due process claim upon which relief can be granted pursuant to 42 U.S.C. § 1983, the allegations in Count I, taken as true, do state a cognizable substantive due process claim based on the alleged actions of Defendant Terry Hagan. Further, Counts II and III of Plaintiff's Complaint allege causes of action recognized by Illinois law, claims over which this Court has supplemental jurisdiction.

# I. **BACKGROUND**

The following facts come from Plaintiff's Complaint (d/e 1).
The Court accepts them as true at the motion to dismiss stage.
<u>Tamayo v. Blagojevich</u>, 526 F.3d 1074, 1081 (7th Cir. 2008).

In late 2010 or early 2011, Plaintiff began dating Tracy
Malone, a resident of Chicago, Illinois, after meeting him at a party
in Quincy, Illinois. During their relationship, Malone mentally
abused Plaintiff through control and violence. On one occasion,
Malone damaged Plaintiff's car by kicking it. Because of Malone's
actions, Plaintiff prohibited him from spending the night at her
apartment or being inside her apartment when she was not present.
Due to these restrictions, Malone stayed in the apartment of
Plaintiff's downstairs neighbor when he came to Quincy to visit
Plaintiff.

On or about May 17, 2011, Malone physically attacked
Plaintiff. He poked Plaintiff in the eye, pushed her to the ground,
and punched and kicked her in the ribs. He also prevented Plaintiff
from calling 911 by grabbing her phone and running into the
apartment of Plaintiff's downstairs neighbor. Plaintiff went to the
hospital for treatment of the injuries she suffered in the attack.

After leaving the hospital, Plaintiff went to the Quincy Police Department (QPD) and reported Malone's attack to Officer David Distin.

Later that night, after Plaintiff had returned home, Malone broke into Plaintiff's apartment and screamed, "Bitch, if I can't have you nobody can. I'm going to kill you." Malone strangled Plaintiff until she went limp. Upon leaving Plaintiff's apartment, Malone was met by Officer Distin and another officer, who had arrived to arrest Malone for attacking Plaintiff earlier that day. The officers arrested Malone, who was subsequently charged with home invasion, aggravated domestic battery, theft, and domestic battery.

At some point after Malone's May 2011 arrest, Plaintiff discovered that she was pregnant with Malone's child. On January 19, 2012, Plaintiff gave birth to T.M., her second child and first with Malone.

Approximately four months earlier, on September 8, 2011, Malone pleaded guilty to theft and domestic violence charges stemming from the incident on May 17, 2011, and was sentenced to four years in the Illinois Department of Corrections (IDOC). Malone was released from prison on or about May 17, 2013. Several

months earlier, in early 2013, Plaintiff and her two children moved from an apartment to a nearby house.

In July 2013, Malone came to Quincy to help take care of T.M. and Plaintiff's other minor child, I.P., while Plaintiff served a 10-day sentence of work release for driving on a suspended license. During this visit, Malone entered Plaintiff's residence and read her personal letters and other private communications, the content of which caused Malone to become jealous and extremely angry. Malone threatened to physically harm Plaintiff. As a result, Plaintiff again told Malone that he was not to be in her residence when she was not there.

During a subsequent visit to Quincy by Malone, Plaintiff asked him to watch her children while she went out with friends. Malone later arrived at Plaintiff's residence with the children and Plaintiff's mother. Malone demanded that Plaintiff take the children out with her. When Plaintiff agreed to do so, Malone became angry, slashed one of the tires on Plaintiff's car, shoved Plaintiff to the ground, took her cell phone and car key, and left. Plaintiff borrowed her cousin's car to meet her friends. When Plaintiff returned home, she found that all four of the tires on her car had been slashed and that a flat

screen television in her residence had been smashed. Plaintiff called the police to report the damage. The next day, Plaintiff discovered that someone had damaged her car by scratching the paint with a key. She again called the police to report the damage. The police attempted to locate Malone but discovered that he had already taken the train back to Chicago.

On January 29, 2014, Plaintiff filed a Complaint for Child Support against Malone in Adams County, Illinois. On March 13, 2014, a court order was entered in that case requiring Malone to pay Plaintiff $170 per month toward the support of T.M. On October 31, 2014, an arrest warrant was issued for Malone due to his failure to appear, as ordered, before the Adams County judge handling the case.

On February 6, 2015, Malone came to Quincy for a visit. The following day, Malone screamed at Plaintiff at her mother's house because he was angry about posts on Plaintiff's Facebook page. A similar altercation occurred at Plaintiff's mother's house on February, 8, 2015, during which Malone, who had been drinking and appeared intoxicated, threatened to enter Plaintiff's residence and destroy her property. In response, Plaintiff, after dropping her

children off at her aunt's house, drove to her own house and put certain electronics in her car so that Malone could not destroy them. After returning to work, Plaintiff called 911 and reported Malone's threat to enter her house and destroy her property. She informed the 911 dispatcher that she would call back when she decided whether she wanted to meet with the police.

Around 90 minutes after Plaintiff's 911 call, Malone left a voicemail on Plaintiff's cell phone that stated, "Bitch, I'm here. I'm waiting." Plaintiff did not listen to the voicemail at the time Malone left it. About five minutes after Malone left the voicemail, the 911 dispatcher called Plaintiff and left a voicemail asking if she wanted police assistance. Plaintiff called the dispatcher fifteen minutes later, informed the dispatcher that she was at work, and reiterated Malone's threat to break into her house and destroy her property. Plaintiff also informed the dispatcher that her work shift ended at 10:45 p.m. and that she wanted a police officer to go by her house before then to ensure that Malone, who was not authorized to be inside her house, was not there. Immediately after Plaintiff's call, the dispatcher conducted a computer check on Malone which revealed that he had an active warrant for his arrest that had been

issued due to Malone's failure to appear in court.

At approximately 9:55 p.m. on February 8, 2015, Defendant Terry Hagan, an officer with the QPD, arrived at Plaintiff's house and requested immediate backup after discovering that someone was inside. Another officer was dispatched to the scene in response to Defendant Hagan's request. Defendant Hagan knocked on the door of Plaintiff's house. Malone came outside while talking on his cell phone and smoking a marijuana blunt and told Defendant Hagan that he had been living at Plaintiff's house for the last year. Defendant Hagan arrested Malone for misdemeanor possession of marijuana and pursuant to the outstanding warrant for his arrest.

Defendant Hagan did not request a criminal history or a Law Enforcement Automated Data System (LEADS) check on Malone, which would have revealed Malone's prior conviction for domestic battery against Plaintiff and subsequent prison sentence. At the time he arrested Malone, Defendant Hagan did not enter Plaintiff's house or make a cursory search to determine whether there was any indication of unauthorized or forced entry, which would have revealed that the door at the northeast corner of Plaintiff's house was broken. Defendant Hagan did not call Plaintiff to inform her

that Malone was in her home or to determine the veracity of Malone's statement regarding his residency there.

Plaintiff, still at work, received a call from her mother informing her that Malone had been arrested at Plaintiff's house, was in jail, and would be released on bond soon. Plaintiff called the QPD to verify what her mother had told her. Plaintiff expressed her concern that Malone was going to come to her house and kill her after he was released. She requested that a police officer be present at her house when she got home from work.

Defendant Hagan was present at Plaintiff's house when Plaintiff arrived. Plaintiff asked Defendant Hagan how Malone had entered her house earlier that day; Defendant Hagan stated that he did not know and that Malone had come to the door when he knocked. Plaintiff, who was upset and crying, told Defendant Hagan that Malone was going to hurt her once he got out of jail. She tried several times to convince Defendant Hagan that she was in danger.

While at her house with Defendant Hagan, Plaintiff, for the first time, listened to the voicemail message Malone left on her cell phone earlier that night. She played the voicemail for Defendant

Hagan, who told Plaintiff that he would include information about the voicemail in his report but stated that there was nothing else he could do. After discovering the broken door in her house and showing it to Defendant Hagan, Plaintiff asked Defendant Hagan if he could arrest Malone for an offense that would prevent him from being released on bond. Defendant Hagan responded that he would include the additional information in his report and "look into it."

Plaintiff's mother arrived at Plaintiff's house while Defendant Hagan was still present. Plaintiff's mother confirmed to Defendant Hagan that Malone did not reside at Plaintiff's house. Plaintiff again told Defendant Hagan that Malone would return to her house and hurt her after Defendant Hagan left. Defendant Hagan assured Plaintiff that she would be safe and that he would be patrolling the area. After watching Plaintiff prop a chair against the broken door of her house in an attempt to secure it, Defendant Hagan left.

Around midnight on February 9, 2015, Plaintiff picked up her two children from her aunt's house and returned home. At around 2:30 a.m., Plaintiff heard a noise downstairs and footsteps on the stairs. Malone burst into Plaintiff's bedroom, where Plaintiff's two children were sleeping with Plaintiff in bed, and said, "Bitch, I'm

gonna kill you." Malone proceeded to stab Plaintiff 34 times before running away. Plaintiff was able to call 911 and was transported to the hospital. In addition to the 34 stab wounds, she suffered a collapsed lung and internal bleeding. She underwent surgery, requiring three blood transfusions, and survived Malone's vicious attack.

After being discharged from the hospital, Plaintiff was unable to take care of herself or her children, and she needed around-the-clock assistance until late March 2015.[1] Plaintiff was prescribed narcotic pain medication for her physical injuries. In addition, Plaintiff suffered from extreme anxiety and depression, later diagnosed as post-traumatic stress disorder (PTSD), and she received both counseling and psychoactive medication as a result of these mental and emotional issues.

On March 9, 2016, Plaintiff filed a three-count Complaint against Defendants. Count I of Plaintiff's Complaint is a claim brought under 42 U.S.C. § 1983 against Defendant Hagan alleging

---

[1] Although Plaintiff references only the month in her Complaint, the Court notes that Plaintiff can only be referring to late March 2015, as Malone's attack occurred in February 2015 and Plaintiff's Complaint was filed on March 9, 2016.

that he violated Plaintiff's constitutional right to due process.[2]

Count II is a state-law claim against Defendant Hagan alleging

willful and wanton misconduct in violation of the Illinois Domestic

Violence Act of 1986. Count III is a state-law claim against the City

of Quincy, Illinois, alleging that it is liable for the willful and wanton

misconduct of Defendant Hagan pursuant to the doctrine of

respondeat superior. On March 31, 2016, Defendants filed their

Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, arguing, with respect to Plaintiff's § 1983 claim,

that Plaintiff has failed to allege facts sufficient to plead a

constitutional violation and that Defendant Hagan is entitled to

qualified immunity. Defendant argues, with respect to Plaintiff's

state law claim against Defendant Hagan, that the claim is barred

by the applicable statute of limitations. Defendant further argues

---

[2]  Although Plaintiff references her rights under the Equal Protection Clause in
paragraphs 94 and 96 of Count I of her Complaint, she has clarified that her §
1983 claim is intended to be based on alleged due process violations.
Response and Memorandum of Law in Opposition to Defendants' Motion to
Dismiss (d/e 9), pp. 4-5. The Court notes briefly that Plaintiff's Complaint is
insufficient to state a cognizable § 1983 claim based on equal protection
grounds. To state such a claim, a plaintiff must allege that "a state actor
purposefully discriminated against him because of his identification with a
particular (presumably historically disadvantaged) group." Sherwin Manor
Nursing Ctr., Inc. v. McAuliffe, 37 F.3d 1216, 1220 (7th Cir. 1994). Plaintiff's
Complaint is devoid of any allegations that Defendant Hagan purposely
discriminated against her because she is a woman or a member of any other
historically disadvantaged group.

that because the claims against Defendant Hagan are deficient, Plaintiff's claim against the City of Quincy, Illinois, is likewise deficient because it is based on vicarious liability, a theory of liability that, in any event, does not apply to § 1983 claims.

## II.  JURISDICTION

This Court has original jurisdiction over Plaintiff's due process claim brought under 42 U.S.C. § 1983 because it is a claim to "redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."  28 U.S.C. § 1343(a)(3); see also 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  Further, this Court has supplemental jurisdiction over Plaintiff's state-law claims because those claims and Plaintiff's § 1983 claim "form part of the same case or controversy."  28 U.S.C. § 1367(a).

## III.  LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a motion to dismiss if a complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Plausibility means alleging factual content that allows a court to reasonably infer that the defendant is liable for the alleged misconduct. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007). A plaintiff's complaint must suggest a right to relief, "raising that possibility above a speculative level." Kubiak v. City of Chicago, 810 F.3d 476, 480 (7th Cir. 2016).

When faced with a Rule 12(b)(6) motion to dismiss, the Court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016). "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011). The Court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim." R.J.R. Servs., Inc. v. Aetna Cas. & Sur. Co., 895 F.2d 279, 281 (7th Cir. 1989).

# IV.  ANALYSIS

## A.  Count I of Plaintiff's Complaint States a Cognizable Due Process Claim Under 42 U.S.C. § 1983.

Federal law imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  In order to state a cognizable § 1983 claim, the plaintiff "must assert the violation of a federal right."  Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989).  The plaintiff must also assert that the person who violated his rights acted under color of state law.  Gomez v. Toledo, 446 U.S. 635, 640 (1980).  Plaintiff claims that Defendant Terry Hagan violated her due process rights both through his actions and omissions on February 8, 2015.  Because Plaintiff's allegations can be read as alleging violations of both her substantive and procedural due process rights, the Court will discuss both claims below.  Although Count I of Plaintiff's Complaint does not state a cognizable procedural due process claim, Count I does state a

cognizable cause of action under 42 U.S.C. § 1983 based on an

alleged violation of Plaintiff's substantive due process rights.

> 1. *Plaintiff's factual allegations are sufficient to state a claim against Defendant Hagan for violating Plaintiff's substantive due process rights.*

Generally, "a State's failure to protect an individual against

private violence simply does not constitute a violation of the Due

Process Clause." DeShaney v. Winnebago Cnty. Dept. of Social

Servs., 489 U.S. 189, 197 (1989); see also Bond v. Atkinson, 728

F.3d 690, 693 (7th Cir. 2013) ("[T]he Constitution does not

guarantee mistake-free law enforcement.").  This general rule is

based on the fact that the purpose of the Due Process Clause "was

to protect the people from the State, not to ensure that the State

protected them from each other."  DeShaney, 489 U.S. at 196.

Indeed, "nothing in the language of the Due Process Clause itself

requires the State to protect the life, liberty, and property of its

citizens against invasion by private actors."  Id. at 195.  In

DeShaney, the Supreme Court held that State actors did not violate

a child's substantive due process rights by failing to remove the

child from his father's care despite having reason to believe that the

father had abused the child on multiple occasions.  Id. at 192-93,

201.

The general rule that a State does not violate a person's substantive due process rights by failing to protect that person from private violence is not absolute, however.  Two exceptions exist. The first exception applies when the State has a "special relationship" with the person harmed, such as "a custodial relationship that cuts off alternative avenues of aid."  <u>D.S. v. E. Porter Cnty. Sch. Corp.</u>, 799 F.3d 793, 798 (7th Cir. 2015). Because Defendant Hagan did not, in any way, limit Plaintiff's ability to leave her house, seek refuge in a shelter, seek an emergency order of protection against Malone, or otherwise protect herself from Malone, the "special relationship" exception does not apply to Plaintiff's § 1983 claim.  <u>See</u> <u>DeShaney</u>, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").

The second exception to the general rule that a State does not violate a person's substantive due process rights by failing to protect that person from private violence, the "state-created danger"

exception, applies "when a state actor's conduct creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger that [sic] they otherwise would have been." E. Porter Cnty. Sch. Corp., 799 F.3d at 798 (internal quotation marks omitted).  This exception is a narrow one.  Flint v. City of Belvidere, 791 F.3d 764, 770 (7th Cir. 2015); see also Doe v. Village of Arlington Heights, 782 F.3d 911, 917 (7th Cir. 2015) (noting that the cases in which the Seventh Circuit has "either found or suggested that liability attaches under the 'state-created danger' exception are rare and often egregious").

To state a claim under the "state-created danger" exception, a plaintiff must allege that "(1) defendants, by their affirmative acts, created or increased a danger to the plaintiff; (2) defendants' failure to protect the plaintiff from that danger proximately caused plaintiff's injuries; and (3) defendants' failure to protect the plaintiff 'shocks the conscience.'" Flint, 791 F.3d at 770.  The first requirement—that State action created or increased a danger to the plaintiff—"must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect." Sandage v. Bd. of Comm'rs of Vanderburgh Cnty., 548 F.3d 595,

599 (7th Cir. 2008); <u>see also</u> <u>id.</u> ("If all that were required was a causal relation between inaction and harm, the rule of *DeShaney* would be undone . . . ."). In order to increase a risk of private violence so as to be liable to the victim for her injuries, the State must do something to transform "a potential danger into an actual one," rather than just standing by and doing nothing to prevent private violence. <u>Id.</u> at 600. In determining whether a danger has been created or increased, the two relevant questions are (1) what affirmative acts did the State take, and (2) what dangers would the plaintiff have faced had the State not taken those actions. <u>Wallace v. Adkins</u>,115 F.3d 427, 430 (7th Cir. 1997). This second inquiry requires a comparison of the danger the plaintiff faced after the State's affirmative acts with the danger the plaintiff faced before those acts were taken, not with the danger that the plaintiff would have faced had the State done what the plaintiff expected it to do. <u>Id.</u> ("However, the question is not what dangers [the plaintiff] would have faced had the prison officials behaved as he wanted them to, but what dangers he would have faced absent the affirmative acts actually taken."). The third requirement of the "state-created danger" exception—that the State's failure to protect the plaintiff

"shocks the conscience"—is "an attempt to quantify the rare 'most egregious official conduct' required for substantive due process liability." Flint, 791 F.3d at 770.

The allegations in Count I of Plaintiff's Complaint regarding Defendant Hagan's conduct are sufficient at this stage to invoke the "state-created danger" exception to the general rule set forth by the Supreme Court in DeShaney— that a State does not violate a person's substantive due process rights by failing to protect that person from private violence. But before the Court details why Count I of Plaintiff's Complaint survives Defendants' Motion to Dismiss, the Court must first explain why certain allegations in Count I have no bearing on the Court's analysis. A substantive due process violation by Defendant Hagan requires an affirmative act on his part. Flint, 791 F.3d at 770. Consequently, Defendant Hagan would not have violated Plaintiff's substantive due process rights if he had chosen not to show up at her house on February 8, 2015, despite having knowledge of Malone's prior attacks on Plaintiff and his recent threats to break into her house and destroy her property. See DeShaney, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played

no part in their creation, nor did it do anything to render him any more vulnerable to them.").  It follows that a substantive due process claim against Defendant Hagan cannot be based on the fact that he (1) did not arrest Malone for a felony, (2) did not provide Plaintiff with information about relief available to domestic abuse victims, (3) did not provide Plaintiff with transportation to a shelter or a judge, (4) did not search Plaintiff's house for evidence of forced entry, or (5) did not request Malone's criminal history.  See Whitlock v. Brueggemann, 682 F.3d 567, 588 (7th Cir. 2012) ("There is no affirmative duty on police to investigate.").

For Plaintiff to state a cognizable substantive due process claim against Defendant Hagan, she must allege facts which show that it is plausible that Defendant Hagan's actions created or increased a threat faced by Plaintiff.  According to Plaintiff, Defendant Hagan went to Plaintiff's house, cordially conversed with Malone regarding whether he resided at Plaintiff's house, and accepted Malone's explanation that he resided there.  See Complaint, ¶ 68; Id., Count I, ¶ 95.  Defendant Hagan arrested Malone for possessing marijuana and having a warrant out for his arrest.  Id. ¶ 69.  After Malone's arrest, Defendant Hagan told

Plaintiff that she would be safe and that he would be patrolling the area.  Id. ¶ 80.  He spoke to Plaintiff's mother, who informed him that Malone did not reside with Plaintiff.  Id. ¶ 79.  Defendant Hagan also informed Plaintiff that he would include information about Malone's threatening voicemail and Plaintiff's broken door in his report and would "look into" arresting Malone for an offense that would prevent him from being released from jail on bond.  Id. ¶¶ 75-78.  Plaintiff has adequately alleged that Defendant Hagan took action on February 8, 2015.  But to invoke the "state-created danger" exception, she must allege that those actions placed her in a more dangerous situation than she would have been in absent those actions.

In an attempt to meet this burden, Plaintiff alleges that Malone was "emboldened" by the actions of Defendant Hagan on February 8, 2015, such that they increased the danger that Malone posed to her.  See id., Count I, ¶¶ 94-95.  Of course, certain of Defendant Hagan's actions, such as his statements to Plaintiff about his report and potentially arresting Malone for a more serious crime and his conversation with Plaintiff's mother, could not have "emboldened" Malone, because they were committed after Malone

had been arrested and removed from Plaintiff's residence. Also working against Plaintiff are the numerous allegations of Malone's attacks on Plaintiff before the events of February 8, 2015. On May 17, 2011, Malone pushed Plaintiff to the ground and struck her in the ribs. Id. ¶¶ 15-16. Plaintiff's injuries in this attack were serious enough for her to seek medical attention at a hospital. Id. ¶ 17. In another incident on the same date, Malone strangled Plaintiff until she went limp. Id. ¶¶ 20-21. This attack was immediately preceded by Malone's threat to kill Plaintiff. Id. ¶ 20 ("Bitch, if I can't have you nobody can. I'm going to kill you."). In yet another attack, Malone shoved Plaintiff to the ground after having slashed one of the tires on her car with a knife. Id. ¶ 42. These allegations show that Plaintiff was subject to the threat of physical violence at the hands of Malone long before Defendant Hagan arrived at Plaintiff's house on February 8, 2015.

But Plaintiff's substantive due process claim survives Defendant's Motion to Dismiss because of the manner in which Malone carried out his attack on February 9, 2015. Although Malone had attacked Plaintiff several times prior to that date, he had never before attacked or harmed Plaintiff with a knife or any

other deadly weapon. Plaintiff does not specifically allege that Malone's attempt on her life was the result of his arrest at the hands of Defendant Hagan. But in his first attack on Plaintiff after Defendant Hagan arrested him, Malone stabbed Plaintiff numerous times. The Court must draw all reasonable inferences in favor of Plaintiff, see Roberts, 817 F.3d at 564, and it is a reasonable inference that Malone's vicious knife attack was the proximate result of being arrested by Defendant Hagan the day prior. In this sense, Malone became a greater risk to Plaintiff as a result of Defendant Hagan's arrest. Indeed, the allegations of Plaintiff's Complaint indicate that Malone's intent in breaking into Plaintiff's house on February 8, 2015, was to destroy her property, not to harm her physically. See Complaint, ¶¶ 56, 58 (alleging that on February 8, 2015, Malone said to Plaintiff, "Bitch, I'm going to go to your house and break all your stuff," and that Plaintiff subsequently reported to a 911 dispatcher that Malone had threatened to go into Plaintiff's house and destroy her property). However, as the events detailed in Plaintiff's Complaint make clear, Malone's intent in breaking into Plaintiff's house in the early morning hours of February 9, 2015, was to do Plaintiff serious

harm by stabbing her repeatedly. If one analyzes the allegations in the Complaint in the light most favorable to Plaintiff, it was Defendant Hagan's arrest of Malone that caused Malone to become a deadly threat to Plaintiff. Defendant Hagan's arrest of Malone, while lawful, occurred as a result of Plaintiff contacting the QPD. This fact could not have been lost on Malone, and Defendant Hagan had to have realized that Malone's arrest could have caused an increase in Malone's anger level. According to the Complaint, before his arrest, Malone was threatening to damage Plaintiff's property, but after his arrest, Malone stabbed Plaintiff numerous times.

The fact that the action serving as the basis for Plaintiff's substantive due process claim was a lawful arrest by Defendant Hagan is not inconsistent with the application of the "state-created danger" exception to the rule promulgated in DeShaney. See Reed v. Gardner, 986 F.2d 1122, 1126-27 (7th Cir. 1993) (holding that the plaintiffs stated a substantive due process claim under 42 U.S.C. § 1983 by alleging that police arrested the driver of a vehicle and left the keys with an intoxicated passenger who later struck another vehicle while driving); White v. Rochford, 592 F.2d 382,

382-83 (7th Cir. 1979) (holding that the plaintiffs stated a substantive due process claim under 42 U.S.C. § 1983 by alleging that police arrested a man for drag racing and subsequently left the three child passengers in the car alone on the side of the road, an experience that allegedly caused the children "mental pain and anguish").  Defendant Hagan's arrest of Malone, like the valid arrests made in White and Reed, increased the danger that someone—here, Plaintiff—faced.  This case, as alleged by Plaintiff in her Complaint, is therefore different from those in which DeShaney barred plaintiffs' § 1983 claims either because the defendant did not act or because the defendant's actions did not increase the danger the plaintiff faced.  See Windle v. City of Marion, 321 F.3d 658, 661-63 (7th Cir. 2003) (affirming the district court's grant of summary judgment in favor of an individual defendant because the plaintiff's claim was based on the defendant's failure to act rather than on the defendant's actions); Wallace, 115 F.3d at 430 (affirming the district court's dismissal of the plaintiff's complaint because the plaintiff would have faced the same danger absent the actions taken by the defendant).   In short, Defendant Hagan's act of arresting Malone on February 8, 2015, is sufficient for Plaintiff to

invoke the "state-created danger" exception.

In conclusion, although <u>DeShaney</u> established a general rule that a State does not violate an individual's substantive due process rights by failing to protect her from private violence, the "state-created danger" exception to the rule allows § 1983 claims where State action transforms a potential threat into an actual one, thereby increasing the level of danger to which a person is subjected. The allegations in Count I of Plaintiff's Complaint are sufficient to state a § 1983 claim under the "state-created danger" exception. Accordingly, Count I of Plaintiff's Complaint states a cognizable claim under 42 U.S.C. § 1983 based on substantive due process grounds.

> 2. *Plaintiff's factual allegations are insufficient to state a claim against Defendant Hagan for violating Plaintiff's procedural due process rights.*

In Count I of her Complaint, Plaintiff claims that Defendant Hagan had a duty pursuant to the Illinois Domestic Violence Act of 1986 (Act) to use all reasonable means to prevent Malone from abusing her further, including arresting Malone, offering Plaintiff immediate and adequate information about relief available to abuse victims, and providing or arranging transportation for Plaintiff and

her children to a nearby place of shelter or safety or to the nearest available judge so Plaintiff could file a Petition for an emergency order of protection.  Complaint, Count I, ¶ 93.  Plaintiff also alleges that Defendant Hagan's actions and omissions violated Plaintiff's statutory rights.  Id., Count I, ¶ 97.  Because these allegations can be construed as a claim based on a violation of Plaintiff's procedural due process rights, the Court analyzes such a claim below.  However, because Plaintiff does not have a property interest protected by the Due Process Clause in police enforcement of the Act, Plaintiff's Complaint does not state a cognizable procedural due process claim.

"An essential component of a procedural due process claim is a protected property or liberty interest."  Domka v. Portage County, Wisconsin, 523 F.3d 776, 779 (7th Cir. 2008).  In the context of a procedural due process claim in which the plaintiff alleges that the State deprived her of property without due process, state law governs whether something is "property" afforded procedural due process while federal law determines the process that is required.  Goros v. County of Cook, 489 F.3d 857, 859 (7th Cir. 2007).

In DeShaney, the Supreme Court analyzed only the plaintiff's

substantive due process rights in the context of state protection from private violence.  <u>See</u> 489 U.S. at 195 ("The claim is one invoking the substantive rather than the procedural component of the Due Process Clause . . . .").  The Court declined to address the plaintiff's argument that a state child protection statute gave an entitlement "to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation."  <u>Id.</u> at 195 n.2.

The Supreme Court took up an issue similar to the one sidestepped in <u>DeShaney</u>, however, in <u>Town of Castle Rock, Colorado v. Gonzales</u>, 545 U.S. 748 (2005).  In <u>Castle Rock</u>, the plaintiff brought an action under 42 U.S.C. § 1983 against the town, alleging that its police department's policy of failing to respond to complaints involving restraining order violations was a violation of the Due Process Clause.  <u>Id.</u>  The plaintiff also alleged that the town's police officers failed to enforce a restraining order she had against her estranged husband after he took their three children during the week without giving advance notice to the plaintiff.  <u>Id.</u> at 751-54.

After the district court granted the town's motion to dismiss,

the Eleventh Circuit reversed, holding that the plaintiff had stated a "cognizable procedural due process claim." Id. at 754. A rehearing en banc produced the same result, with the full appellate court holding that the plaintiff had a "protected property interest in the enforcement of the terms of her restraining order." Id. at 754-55.

The Supreme Court reversed, holding that the plaintiff did not have a property interest protected by the Due Process Clause in police enforcement of the restraining order. Id. at 768. At the heart of the plaintiff's claim was a Colorado statute stating that "[a] peace officer shall use every reasonable means to enforce a restraining order" and that "[a] peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person." Id. at 759 (citing Colo. Rev. Stat. § 18-6-803.5(3)(a)). The restraining order that the plaintiff sought to have enforced contained language nearly identical to that of the Colorado statute. Id. at 752. The statute did not grant plaintiff a property interest in the enforcement of her restraining order, however, because it did not mandate police enforcement of restraining orders. Id. at 760. The Supreme Court's holding was based on the fact that a "well established tradition of police

discretion has long coexisted with apparently mandatory arrest statutes." Id.

The Supreme Court's reasoning in Castle Rock is just as applicable to a procedural due process claim based on a police officer's alleged failure to comply with section 304 of the Illinois Domestic Violence Act. This section, entitled "Assistance by law enforcement officials" states, in pertinent part, as follows:

> Whenever a law enforcement officer has reason to believe that a person has been abused, neglected, or exploited by a family or household member, the officer shall immediately use all reasonable means to prevent further abuse, neglect, or exploitation, including:
>
> (1) Arresting the abusing, neglecting and exploiting party, where appropriate;
>
> (2) If there is probable cause to believe that particular weapons were used to commit the incident of abuse, subject to constitutional limitations, seizing and taking inventory of the weapons;
>
> (3) Accompanying the victim of abuse, neglect, or exploitation to his or her place of residence for a reasonable period of time to remove necessary personal belongings and possessions;
>
> (4) Offering the victim of abuse, neglect, or exploitation immediate and adequate information (written in a language appropriate for the victim or in Braille or communicated in appropriate sign language), which shall include a summary of the procedures and relief available to victims of abuse under subsection (c) of

Section 217 and the officer's name and badge number;

(5) Providing the victim with one referral to an accessible service agency;

(6) Advising the victim of abuse about seeking medical attention and preserving evidence (specifically including photographs of injury or damage and damaged clothing or other property); and

(7) Providing or arranging accessible transportation for the victim of abuse (and, at the victim's request, any minors or dependents in the victim's care) to a medical facility for treatment of injuries or to a nearby place of shelter or safety; or, after the close of court business hours, providing or arranging for transportation for the victim (and, at the victim's request, any minors or dependents in the victim's care) to the nearest available circuit judge or associate judge so the victim may file a petition for an emergency order of protection under subsection (c) of Section 217. When a victim of abuse chooses to leave the scene of the offense, it shall be presumed that it is in the best interests of any minors or dependents in the victim's care to remain with the victim or a person designated by the victim, rather than to remain with the abusing party.

750 Ill. Comp. Stat. 60/304(a). The operative language in this section of the Illinois Domestic Violence Act is analogous to the operative statutory language in Castle Rock with respect to granting police officers discretion in carrying out their public duties.

Compare 750 Ill. Comp. Stat. 60/304(a) ("Whenever a law enforcement officer has reason to believe that a person has been

abused, neglected, or exploited by a family or household member, the officer shall immediately use <u>all reasonable means</u> to prevent further abuse, neglect, or exploitation . . . .") (emphasis added), <u>with</u> Colo. Rev. Stat. § 18-6-803.5(3)(a) ("Whenever a restraining order is issued, the protected person shall be provided with a copy of such order. A peace officer shall use <u>every reasonable means</u> to enforce a restraining order.") (emphasis added). Further, section 304 does not require police officers to take any of the specific actions enumerated therein. <u>Farrar v. City of Chicago</u>, 291 F. Supp. 2d 747, 755 (N.D. Ill. 2003) ("[T]he Illinois Domestic Violence Act does not require law enforcement officers to arrest every abusive individual; it only requires them to use <u>reasonable means</u>.") (emphasis added); <u>see also</u> 750 Ill. Comp. Stat. 60/304(a) (requiring a police officer to arrest "the abusing, neglecting and exploiting party, <u>where appropriate</u>") (emphasis added). Nor does the statutory provision require police officers to arrest a domestic abuser for any specific offense.

The language in section 304 makes clear that Illinois police officers have discretion in determining what that statutory provision requires. <u>See</u> <u>Tyska by Tyska v. Bd. of Educ. Twp. High Sch. Dist.</u>

214, Cook Cnty., 453 N.E.2d 1344, 1350 (Ill. App. Ct. 1983)

("Discretion in the manner of the performance of an act arises when the act may be performed in one of two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed. But when a positive duty is enjoined, and there is but one way in which it can be performed lawfully, then there is no discretion."). This discretion is undoubtedly necessary, as not all of the actions enumerated in section 304 will be needed in every scenario. Indeed, because Plaintiff was not physically abused on February 8, 2015, she did not need Defendant Hagan to seize any weapons, advise her about seeking medical attention, or provide transportation to a medical facility. Because Plaintiff's interaction with Defendant Hagan was at her house after Malone had been arrested, she did not need him to accompany her there so she could remove personal belongings. Indeed, Plaintiff does not allege that Defendant Hagan had a duty to perform those actions. The fact that section 304 requires police officers to use only "all reasonable means" to prevent domestic abuse means that the provision's requirements do not rise to the level of an entitlement to police

action afforded protection under the Due Process Clause.  <u>See</u>

<u>Castle Rock</u>, 545 U.S. at 761 (noting that "a true mandate of police

action" would require more than language stating "'shall use every

reasonable means to enforce a restraining order' (or even 'shall

arrest . . . or . . . seek a warrant')").  Given that police officers have

discretion on how to comply with section 304, Plaintiff cannot be

said to have a property interest in the enforcement of that

particular statutory provision.  <u>See</u> <u>id.</u> at 756 ("Our cases recognize

that a benefit is not a protected entitlement if government officials

may grant or deny it in their discretion.").

Plaintiff correctly notes that for over 20 years, Illinois has

recognized a civil cause of action against police officers who fail to

enforce the Illinois Domestic Violence Act in certain circumstances.

<u>See</u> <u>Calloway v. Kinkelaar</u>, 659 N.E.2d 1322, 1328 (Ill. 1995) ("To

give effect to the legislature's purposes and intent in enacting the

Domestic Violence Act, we believe judicial recognition of a right of

action for civil damages is necessary, provided that the injured

party can establish that he or she is a person in need of protection

under the Act, the statutory law enforcement duties owed to him or

her were breached by the willful and wanton acts or omissions of

law enforcement officers, and such conduct proximately caused plaintiff's injuries."); see also 750 Ill. Comp. Stat. 60/305 (providing immunity from civil liability to law enforcement officers "acting in good faith in rendering emergency assistance or otherwise enforcing" the Act for their actions and inactions, but only if those actions and inactions do not constitute willful and wanton misconduct).  But, unfortunately for Plaintiff, the mere fact that Defendant Hagan could be liable for failing to enforce the Act does not save her procedural due process claim, as "state law cannot be enforced through § 1983."  Bond, 728 F.3d at 693; see also Windle, 321 F.3d at 662 ("With nothing more to go on than a state statute, [the plaintiff] cannot succeed in saving her claim.  State law violations do not form the basis for imposing § 1983 liability.").  The reason for this rule is that the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation."  DeShaney, 489 U.S. at 202; see also Archie v. City of Racine, 847 F.2d 1211, 1216–17 (7th Cir. 1988) (en banc) (quoting Snowden v. Hughes, 321 U.S. 1, 11 (1944)) ("A state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state

law.  State rather than federal courts are the appropriate institutions to enforce state rules.").  In short, just because a statute imposes a duty on State actors does not necessarily mean that the statute conveys a constitutionally-protected property interest.

The idea that Plaintiff has a constitutionally-protected property interest in police enforcement of section 304 of the Act is further discounted by the fact that Defendant Hagan is liable to Plaintiff in state court only if his actions or omissions constitute "willful and wanton misconduct."  See 750 Ill. Comp. Stat. 60/305. Accordingly, a police officer can be held civilly liable for failing to perform the actions listed in section 304 only if those omissions evidence a conscious disregard for the safety of the domestic abuse victim.  See id.; Fagocki v. Algonquin/Lake-In-The-Hills Fire Prot. Dist., 496 F.3d 623, 627 (7th Cir. 2007) (citing Pfister v. Shusta, 657 N.E.2d 1013, 1016 (Ill. 1995)) (noting that willful and wanton conduct is defined in Illinois jurisprudence as conduct "exhibiting an utter indifference to or conscious disregard for safety") (internal quotation marks omitted).  This demanding standard is inconsistent with victims of domestic abuse having an entitlement to police

enforcement of section 304 of the Act that would be protected by the Due Process Clause.  <u>See</u> <u>Castle Rock</u>, 545 U.S. at 756 (quoting <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972)) ("The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.'").

The <u>Castle Rock</u> majority did agree with the dissenting Justices in noting that some domestic violence statutes have been found to be "more mandatory than traditional mandatory-arrest statutes."  <u>Id.</u> at 762.  But the statutes at issue in the cases cited by the <u>Castle Rock</u> dissent—cases from Oregon, Tennessee, New Jersey, and Washington—contain language that is more mandatory than the language contained in section 304.  <u>See</u> Or. Rev. Stat. Ann. § 133.310(3) ("A peace officer <u>shall arrest and take into custody</u> a person without a warrant when the peace officer has probable cause to believe" that the person has violated a restraining order.) (emphasis added); Tenn. Code Ann. § 36-3-611(a) ("Any law

enforcement officer <u>shall arrest</u> the respondent without a warrant" if the officer has "proper jurisdiction over the area in which the violation occurred; . . . has reasonable cause to believe the respondent has violated or is in violation of an order for protection; and . . . has verified whether an order of protection is in effect against the respondent.") (emphasis added); N.J. Stat. Ann. § 2C:25-31 ("Where a law enforcement officer finds that there is probable cause that a defendant has committed contempt of [a domestic violence restraining order] the defendant <u>shall be arrested and taken into custody</u> by a law enforcement officer.") (emphasis added); Wash. Rev. Code Ann. § 10.99.030(6)(a) ("When a peace officer responds to a domestic violence call and has probable cause to believe that a crime has been committed, the peace officer <u>shall exercise arrest powers</u> . . . .").

In contrast to the statutes on which the <u>Castle Rock</u> dissent relied, section 304 of the Act states that police officers shall arrest domestic abusers only "where appropriate."  750 Ill. Comp. Stat. 60/304(a)(1).  And do not forget, Defendant Hagan did arrest Malone, albeit not for domestic violence.  But section 304 does not say that an officer must arrest a domestic abuser for domestic

violence.   As noted above, the discretionary language of section 304 precludes a finding that Plaintiff has a constitutionally-protected property interest in police enforcement of that statutory provision. Further, even if Plaintiff had a protectable property interest in police enforcement of section 304, Plaintiff's opportunity to pursue her claims in state court will provide her with due process.  Archie, 847 F.2d at 1217.

Plaintiff has alleged no cognizable procedural due process claim, regardless of whether the actions listed in section 304 of the Act are truly mandated for police officers.  Indeed, in Castle Rock, the Supreme Court did not rely only on the discretionary nature of the Colorado statute in holding that the plaintiff did not have a property interest in police enforcement of the restraining order.  The Court also held that the plaintiff could not be entitled to police enforcement of the restraining order through the request for an arrest warrant because the interest would be nothing more than procedure—something insufficient to serve as the basis of a property interest protected by the Due Process Clause.  Castle Rock, 545 U.S. at 764; see also id. at 771 (Souter, J., concurring) (noting that the plaintiff's claim of "a property interest in a state-

mandated process in and of itself" was "at odds with the rule that [p]rocess is not an end in itself," as the "constitutional purpose [of process] is to protect a substantive interest to which the individual has a legitimate claim of entitlement") (internal quotation marks omitted); <u>Sung Park v. Indiana Univ. Sch. of Dentistry</u>, 692 F.3d 828, 832 (7th Cir. 2012) (holding that the plaintiff's "interest in contractually-guaranteed university process is not protected by the federal Constitution"). Thus, even if section 304 was devoid of discretionary language, Plaintiff still could not have a constitutionally-protected property interest in the <u>process</u> that the statutory provision establishes for police officers: arresting the abuser, seizing weapons, accompanying the victim to her residence, offering the victim a summary of the procedures and relief available to her, referring the victim to a service agency, advising the victim about seeking medical care and preserving evidence, and providing transportation to a judge or a medical facility. <u>See</u> 750 Ill. Comp. Stat. 60/304(a). As the Seventh Circuit has noted, "[t]he procedural guarantees of the Due Process Clause exist apart from state law, even though they depend on it." <u>Archie</u>, 847 F.2d at 1217. Accordingly, "if state law establishes procedural entitlements, these

are not themselves property and will not be enforced in the name of the Constitution." Id. For this additional reason, Count I of Plaintiff's Complaint does not state a cognizable procedural due process claim against Defendant Hagan under 42 U.S.C. § 1983.

In conclusion, the allegations in Count I of Plaintiff's Complaint, taken as true, are sufficient to state a claim based on a violation of Plaintiff's substantive due process rights through the actions of Defendant Terry Hagan. Accordingly, Plaintiff has stated a claim pursuant to 42 U.S.C. § 1983 upon which relief can be granted. However, for the reasons stated above, the allegations in Count I do not state a cognizable claim based on procedural due process grounds.

**B.** **Defendants Are Not Entitled to Qualified Immunity.**

Because Plaintiff has adequately pleaded a cognizable claim under 42 U.S.C. § 1983 based on a violation of her substantive due process rights by Defendant Hagan, the Court must determine whether the allegations in Count I of Plaintiff's Complaint are sufficient to establish that Defendant Hagan is entitled to qualified immunity on that claim. "[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds . . . [b]ecause an

immunity defense usually depends on the facts of the case."
Alvarado v. Litscher, 267 F.3d 648, 651 (7th Cir. 2001). "The
affirmative defense of qualified immunity protects government
officers from liability for actions taken in the course of their official
duties if their conduct does not violate 'clearly established statutory
or constitutional rights of which a reasonable person would have
known.'" Hardaway v. Meyerhoff, 734 F.3d 740, 743 (7th Cir. 2013)
(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In
determining whether qualified immunity applies here, the Court
considers only those facts knowable to Defendant Hagan. See
White v. Pauly, 137 S. Ct. 548, 550 (2017).

The two-prong test used to determine if qualified immunity
applies requires the court to determine "(1) whether the facts,
viewed in a light most favorable to the injured party, demonstrate
that the conduct of the officers violated a constitutional right, and
(2) whether that right was clearly established at the time the
conduct occurred." Hardaway, 734 F.3d at 743 (citing Pearson v.
Callahan, 555 U.S. 223, 232 (2009)). "To be 'clearly established,' a
right must be defined so clearly that every reasonable official would
have understood that what he was doing violated that right."

Dibble v. Quinn, 793 F.3d 803, 808 (7th Cir. 2015). The plaintiff

bears the burden of showing that the constitutional right at issue

was clearly established. Arlington Heights, 782 F.3d at 915. To

meet this burden, the plaintiff must establish that the alleged

misconduct was an obvious violation of a constitutional right or

that a court has upheld the purported right in a factually similar

case. Id. "The right allegedly violated must be established not as a

broad general proposition but in a particularized sense so that the

contours of the right are clear to a reasonable official." Dibble, 793

F.3d at 808 (internal quotation marks omitted); see also White, 137

S. Ct. at 552 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011))

(reiterating that "'clearly established law' should not be defined 'at a

high level of generality'"). This is not to say that State action is

protected by qualified immunity unless the same action has

previously been held unlawful, "but it is to say that in the light of

pre-existing law the unlawfulness must be apparent." Hope v.

Pelzer, 536 U.S. 730, 739 (2002).

Regarding the first prong—whether the facts demonstrate the

violation of a constitutional right—as noted above, the allegations in

Count I of Plaintiff's Complaint are sufficient to state a claim based

on a violation of Plaintiff's substantive due process rights. Relevant to the second prong, Plaintiff, in responding to Defendants' Motion to Dismiss, cites several Seventh Circuit cases where the "state-created danger" exception allowed for a plaintiff's § 1983 substantive due process claim to proceed. At the time of Defendant Hagan's alleged actions on February 8, 2015, the cases cited by Plaintiff had clearly established that Plaintiff had a constitutional right to have the police refrain from acting in such a way so as to increase the danger that she faced. In White v. Rochford, three minors were riding in a car driven by a man who was an uncle of at least two of them. 592 F.2d at 382. The police arrested the uncle for drag racing, and he pleaded with them to take the children to the police station or a phone booth so they could call their parents, but the police refused, instead leaving the children in an abandoned car on the side of the road. Id. The children eventually left the car, crossed eight lanes of traffic, and wandered on the freeway in cold weather at night before finding a phone, which they used to call for help. Id. Two of the children suffered mental or physical injuries on account of the ordeal. Id.

In Reed v. Gardner, police arrested the sober driver of a car,

leaving an intoxicated passenger inside the car with the driver's keys. 986 F.2d at 1124. The intoxicated passenger, while driving the car of the person arrested, struck another vehicle head on at a high speed while being pursued by police. <u>Id.</u> at 1123. The accident killed two people and injured several others. <u>Id.</u> at 1124.

In <u>Monfils v. Taylor</u>, a paper mill employee left an anonymous tip with police that one of his coworkers was going to steal property from their employer. 165 F.3d 511, 513 (7th Cir. 1998). The tipster made several follow-up calls to plead that a recording of the anonymous tip not be released to the person implicated by the tip. <u>Id.</u> at 514-15. Despite the tipster's efforts and assurances by police officers and an assistant district attorney that the tape would not be released, a police officer gave a copy of the recorded conversation to the would-be thief. <u>Id.</u> at 515. The tipster was killed a short time later by six of his coworkers. <u>Id.</u>

In <u>White</u>, <u>Reed</u>, and <u>Monfils</u>, the Seventh Circuit held that substantive due process claims were cognizable under the "state-created danger" exception. <u>White</u>, 592 F.2d at 383 ("[T]he issue before this court is whether the unjustified and arbitrary refusal of police officers to lend aid to children endangered by the

performance of official duty violates the constitution where that refusal ultimately results in physical and emotional injury to the children. We hold that such conduct indisputably breaches the Due Process Clause."); Reed, 986 F.2d at 1125 ("Police officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable."); Monfils, 165 F.3d at 518 (holding that a police officer's action of assuring an assistant district attorney that the recording of the anonymous tip would not be released but not following through on that assurance "created a danger [the tipster] would not have otherwise faced"). In these cases, the State took action that subjected someone to a danger that they would not have been in absent the State action. Put another way, each plaintiff "was safe, or at least considerably safer, before the police acted." Arlington Heights, 782 F.3d at 917. In White, the children would not have been left on the side of the road had the police not arrested the driver of the car for drag racing. In Reed, those killed or injured would not have been subject to the risk of being hit by the drunk driver had the police not arrested the sober driver and left the keys with an intoxicated passenger. The tipster in Monfils

might still be alive had the police not given a copy of the recorded anonymous tip to the coworker being informed upon.

Similarly, in this case, the allegations of the Complaint, when viewed in the light most favorable to Plaintiff, demonstrate that Plaintiff would not have been stabbed by Malone in the early morning hours of February 9, 2015, had Defendant Hagan not arrested Malone at Plaintiff's house the day earlier. White and Reed provided Defendant Hagan with notice that a valid arrest could put another person in danger such that State action was required to guard against that danger. Monfils provided Defendant Hagan with notice that police action transforming one person from a potential threat into an actual threat to another person requires police action to prevent harm in order to satisfy the Due Process Clause. Accordingly, the constitutional right that Defendant Hagan is alleged to have violated was clearly established at the time he arrested Malone on February 8, 2015. Although Defendant Hagan could not have known with certainty what Malone was going to do once he was released on bond, neither could the police in Monfils have known for certain what would happen to the tipster after the person informed upon received a recording of the anonymous tip.

While Defendant Hagan was merely doing his duty on February 8, 2015, his actions increased the risk that Malone posed to Plaintiff. Defendant Hagan therefore had a duty to protect Plaintiff from Malone, a duty that he did not honor if the allegations of the Complaint are to be believed. The end result is that the allegations of Plaintiff's Complaint are sufficient to prevent this Court from dismissing Count I on the grounds of qualified immunity.

While there are numerous cases in which § 1983 claims have been defeated by the rule promulgated in DeShaney—that a State does not violate a person's substantive due process rights by failing to protect that person from private violence—those cases share a common trait: either the state actors committed no affirmative act or the act committed neither created nor increased a danger. See Windle, 321 F.3d at 660-62 (7th Cir. 2003) (defendant not liable because plaintiff's claim was based on defendant's failure to intervene for two months after hearing intercepted phone conversations that revealed an inappropriate sexual relationship between a teacher and the plaintiff, a minor student); Wallace, 115 F.3d at 430 (defendants not liable because their actions of ordering the plaintiff, a prison guard, to remain at his post and assuring him

that they were taking steps to protect him did not increase the

danger that the plaintiff faced because he had a duty to remain at

his post until told otherwise).  When looking at the allegations of

Count I of Plaintiff's Complaint in the context of the cases described

above, the Court cannot determine at this time that Defendant

Hagan is entitled to the affirmative defense of qualified immunity.

C.     **The Allegations in Counts II and III of Plaintiff's
       Complaint Are Sufficient to State Timely Claims
       Under Illinois Law.**

Before analyzing whether the allegations in Count II of

Plaintiff's Complaint state a claim under Illinois law, the Court

must first determine whether such a claim has been timely filed.

Two Illinois statutes are relevant to this inquiry.  Section 8-101 of

the Illinois Local Government and Governmental Employees Tort

Immunity Act (Tort Immunity Act), entitled "Limitation," states as

follows: "No civil action . . . may be commenced in any court against

a local entity or any of its employees for any injury unless it is

commenced within one year from the date that the injury was

received or the cause of action accrued."  745 Ill. Comp. Stat. 10/8-

101(a).  Plaintiff does not dispute that her state claim against

Defendant Hagan is subject to this statute of limitations.  Nor can

Plaintiff dispute that she filed suit on March 9, 2016, more than one year after Defendant Hagan's alleged tortious conduct. But in arguing that her state law claim against Defendant Hagan was timely filed, Plaintiff relies on section 13-211 of the Illinois Code of Civil Procedure (Code), entitled "Minor and persons under legal disability": "If the person entitled to bring an action, specified in Sections 13-201 through 13-210 of this Code, at the time the cause of action accrued, . . . is under a legal disability, then he or she may bring the action within 2 years after . . . the disability is removed." 735 Ill. Comp. Stat. 5/13-211. Section 13-202 of the Code governs action for damages stemming from personal injuries. 735 Ill. Comp. Stat. 5/13-202.

Although section 13-211 of the Code gives a plaintiff two years to file a claim once a legal disability is removed, because Plaintiff's claim against Defendant Hagan is governed by the Tort Immunity Act, Plaintiff had only one year to file her claim once her legal disability was removed. Basham v. Hunt, 773 N.E.2d 1213, 1223 (Ill. App. Ct. 2002) (holding that the section 8-101 of the Tort Immunity Act controls over section 13-211 of the Code, meaning that a plaintiff whose claim was governed by the Tort Immunity Act

has to file within one year of the removal of the plaintiff's legal disability). Accordingly, for Plaintiff's state law claim against Defendant Hagan to have been timely filed, she must have been under a legal disability from Malone's February 2015 attack until at least March 9, 2015.

A person suffers from a legal disability where she is "entirely without understanding or capacity to make or communicate decisions regarding [her] person" and unable to manage her estate or financial affairs. Basham, 773 N.E.2d at 1221. A plaintiff must allege both a lack of capacity to make decisions about her person and an inability to manage her affairs in order to toll a statute of limitations based on a legal disability. See Selvy v. Biegel, 723 N.E.2d 702, 708-09 (Ill. App. Ct. 1999) (holding that a defendant did not properly allege a legal disability based solely on his inability to look after his daily affairs for 10 months following a leg fracture, surgery, and a hospital stay because the defendant did not allege that he "was without understanding or capacity to make or communicate decisions about his person"). "In a personal injury case, a person is not legally disabled if he or she can comprehend the nature of the injury and its implications." Basham, 773 N.E.2d

at 1221.

The Complaint alleges that after Malone's attack, Plaintiff was discharged from the hospital on narcotic pain medication and psychoactive medication. Complaint, ¶ 88. Plaintiff could not take care of herself or her children and needed around-the-clock assistance until late March 2015. Id. Further, Plaintiff suffered from a mental illness or mental deterioration, anxiety, and depression. Id. ¶ 89. Until late March 2015, Plaintiff was completely incapacitated, both physically and mentally, and was unable to manage her duties and affairs. Id. ¶¶ 88-90. The Court finds that these allegations, taken as true, are sufficient to establish that Plaintiff was under a legal disability from the date of Malone's attack until late March 2015. Given that Plaintiff's Complaint was filed on March 9, 2016, the allegations in Count II are sufficient to establish that the Complaint was filed within the one year provided by the section 8-101 of the Tort Immunity Act. Having made this determination, the Court must now determine whether the allegations of Count II state a valid claim under Illinois law.

As noted above, section 304 of the Illinois Domestic Violence Act requires a police officer who "has reason to believe that a person

has been abused, neglected, or exploited by a family or household member" to "immediately use all reasonable means to prevent further abuse, neglect, or exploitation."  750 Ill. Comp. Stat. 60/304(a).  The non-exhaustive list of "reasonable means" includes the following actions: (1) arresting the abuser, (2) seizing weapons if there is probable cause to believe that weapons were used to commit the abuse, (3) accompanying the abuse victim to her residence so she can remove belongings, (4) offering the abuse victim information on the relief available to abuse victims, (5) providing the abuse victim with a referral to a service agency, (6) advising the abuse victim about preserving evidence and seeking medical attention, and (7) providing or arranging transportation for the abuse victim to go to a medical facility, a "nearby place of shelter or safety," or the nearest available judge.  Id.

The Illinois Supreme Court has recognized a civil cause of action against police officers who breach the duties imposed on them by the Act.  See Calloway, 659 N.E.2d at 1328 ("To give effect to the legislature's purposes and intent in enacting the Domestic Violence Act, we believe judicial recognition of a right of action for civil damages is necessary . . . .").  To state a claim based on the

Act, the plaintiff must allege (1) that she "is a person in need of
protection under the Act," (2) that the duties owed to her under the
Act "were breached by the willful and wanton acts or omissions of
law enforcement officers," and (3) that the willful and wanton
conduct proximately caused her injuries.  Id.; see also 750 Ill.
Comp. Stat. 60/305 (excluding willful and wanton misconduct from
the immunity provided to law enforcement officers "rendering
emergency assistance or otherwise enforcing" the Act).  Accordingly,
the allegations in Count II of Plaintiff's Complaint must satisfy these
three requirements to defeat Defendants' Motion to Dismiss.

Plaintiff's allegations in Count II are indeed sufficient to satisfy
a claim against Defendant Hagan based on the Illinois Domestic
Violence Act.  The Act protects "any person abused by a family or
household member."  750 Ill. Comp. Stat. 60/201(a)(i).  "Abuse," as
defined in the Act, includes "physical abuse" and "harassment."
750 Ill. Comp. Stat. 60/103(1).  "Domestic violence" is defined in
exactly the same way.  See 750 Ill. Comp. Stat. 60/103(3).
"Harassment" is defined as unreasonable conduct that "would
cause a reasonable person emotional distress" and in fact does
cause emotional distress.  750 Ill. Comp. Stat. 60/103(7).  "Family

or household members" include "persons who have or allegedly have a child in common."  750 Ill. Comp. Stat. 60/103(6).

Malone meets the statutory definition of "family or household member," as he has a child with Plaintiff.  Complaint, ¶¶ 31-32. The allegations of the Complaint detail several instances where Malone, prior to February 8, 2015, either physically abused Plaintiff or engaged in unreasonable conduct that caused Plaintiff emotional distress.  See id. ¶¶ 11, 16, 20, 42.  The Complaint alleges that on February 8, 2015, Plaintiff, upset and crying, told Defendant Hagan that Plaintiff was in danger and that Malone would hurt her after being released on bond.  Id. ¶¶ 74, 80.  Plaintiff, frantic after hearing a threatening voicemail left on her phone by Malone, played the message for Defendant Hagan.  Id. ¶ 75.  Plaintiff was in tears as she pleaded with Defendant Hagan to arrest Malone for a crime that would prevent Malone from being released on bond.  Id. ¶ 78. These allegations are sufficient to state that Plaintiff had been abused by a "family or household member" and was therefore a person in need of the Act's protections on February 8, 2015, thereby satisfying the first element of her state law claim against Defendant Hagan.

The allegations in Plaintiff's Complaint also state that Defendant Hagan, through his willful and wanton actions and omissions, breached the duty that was imposed on him by the Illinois Domestic Violence Act with respect to Plaintiff. A police officer can be held liable for breaching the duties imposed by the Act only if his actions or omissions constitute "willful or wanton misconduct." 750 Ill. Comp. Stat. 60/305. Further, for the Act to be implicated, the police officer must be "rendering emergency assistance or otherwise enforcing" the Act. Id. "Implicit within the definition of 'otherwise enforcing' is some police involvement or contact with a protected person or someone on his or her behalf." Lacey v. Village of Palatine, 904 N.E.2d 18, 27 (Ill. 2009). Willful and wanton misconduct is a course of action that evidences "an utter indifference to or conscious disregard for a person's own safety or the safety or property of others." Pfister, 657 N.E.2d at 1016.

Plaintiff alleges that Defendant Hagan breached section 304 of the Illinois Domestic Violence Act by (1) failing to arrest Malone for his unlawful forced entry into Plaintiff's house, (2) failing to investigate the relationship between Plaintiff and Malone, (3) failing

to obtain Malone's criminal history before arresting him, (4) failing to provide Plaintiff with information on the relief available to abuse victims, (5) failing to inform Plaintiff of the availability of transportation to a "nearby place of shelter or safety," and (6) failing to inform Plaintiff of the availability of transportation to the nearest available judge in order to obtain an emergency order of protection against Malone. Complaint, Count II, ¶ 96. Plaintiff describes these alleged omissions as "willful and wanton." Id. Although some of these alleged omissions track the actions listed in section 304, some do not. However, section 304 does not limit the actions that a police officer must take when the officer has reason to think a person has been abused to those listed in the statute. See 750 Ill. Comp. Stat. 60/304(a) (requiring police officers to "immediately use all reasonable means to prevent further abuse, neglect, or exploitation, including" those listed in the statute) (emphasis added).

Plaintiff's allegations of the specific omissions through which Defendant Hagan breached his duty to Plaintiff under the Act must be viewed in conjunction with the other allegations of the Complaint. Defendant Hagan knew that Malone had abused

Plaintiff in the past.  Complaint, Count I, ¶ 92 (incorporated into Count II).  Defendant Hagan knew that Malone had left Plaintiff a threatening voicemail.  Id. ¶ 75.  Defendant Hagan knew that one of the doors in Plaintiff's house had been broken off its hinges and that Plaintiff had attempted to secure the broken door by propping a door up against it.  Id. ¶¶ 77, 81.  Plaintiff, crying, told Defendant Hagan that Malone was going to return to Plaintiff's residence and hurt her.  Id. ¶¶ 74, 80.  These allegations support Plaintiff's contention that Defendant Hagan's decision to forego certain actions, some of which are specifically listed in section 304 of the Act evidence a conscious disregard of Plaintiff's safety.  Plaintiff also alleges that Malone's attack and the injuries sustained by Plaintiff as a result were the direct and proximate result of Defendant Hagan's actions in violation of Plaintiff's constitutional rights and Defendant Hagan's failures to comply with the Act.  Complaint, Count II, ¶ 97.  When viewing these allegations together, the Court concludes that Count II states a plausible, as opposed to speculative, claim based on Defendant Hagan's willful and wanton failures to comply with the Illinois Domestic Violence Act.

Count III of Plaintiff's Complaint asserts that the City of

Quincy, Illinois (Quincy), is vicariously liable for Defendant Hagan's willful and wanton conduct in violation of the Act.  Id., Count III, ¶ 98.  Plaintiff alleges that Defendant Hagan, on February 8, 2015, and at all other times relevant to Plaintiff's Complaint, was employed by Quincy and was acting within the scope of his employment as a police officer.  Id. ¶ 3.  Accordingly, Count III states a valid cause of action against Quincy based on the theory of respondeat superior with respect to Defendant Hagan's alleged willful and wanton misconduct in violating the Act.  See Bagent v. Blessing Care Corp., 862 N.E.2d 985, 991 (Ill. 2007) ("Under the theory of *respondeat superior*, an employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment.").

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (d/e 7) is DENIED.  Although Count I of Plaintiff's Complaint does not state a cognizable procedural due process claim, the allegations in Count I, taken as true, do state a substantive due process claim based on the actions of Defendant Terry Hagan for which relief can be granted pursuant to 42 U.S.C. § 1983.  Further, Counts II and III

of Plaintiff's Complaint allege causes of action recognized by Illinois law. Pursuant to Rule 12(a)(4)(A) of the Federal Rules of Civil Procedure, Defendants have 14 days from the date they receive a copy of this Order to file a response to Plaintiff's Complaint.

ENTER: March 30, 2017.

*/s/ Sue E. Myerscough*
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE